IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01055-MSK-KLM

PRISON LEGAL NEWS,

    Plaintiff,

v.

EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS,

    Defendant.

---

**DECLARATION OF ALAN PRENDERGAST IN SUPPORT OF
PRISON LEGAL NEWS'S MOTION FOR SUMMARY JUDGMENT**

---

I, Alan Prendergast, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. For the past 28 years, I have been a professional journalist based in Denver, Colorado. I am the author of a nonfiction book, <u>The Poison Tree: A True Story of Family Violence and Revenge</u> (Putnam, 1986). My work has appeared in a variety of regional and national publications, including the New York Times, the Los Angeles Times, USA Today, Rolling Stone, and Outside. For the past decade, I have also taught journalism courses as a visiting instructor at Colorado College, a private liberal arts college in Colorado Springs.

2. Since 1995, I have worked as a staff writer at Westword, a Denver weekly newspaper with a circulation of approximately 100,000. During that time, I have written extensively on criminal justice matters and particularly corrections issues at a local, state, and federal level.

**Exhibit 2**

3. I have also participated in several panel discussions addressing prison reporting and access issues at national conferences sponsored by professional journalism associations, including those hosted by Investigative Reporters and Editors (IRE), the Society of Professional Journalists (SPJ), and the Association of Alternative Newspapers (AAN).

4. Several of my articles reporting on conditions of confinement within the U.S. Bureau of Prisons have been finalists or winning entries in national journalism awards competitions; one is featured in a recently published anthology, The Best American Crime Reporting 2008.

5. In May 2000, Westword published the first of what would become a series of articles and blogs authored by me dealing with inmate-on-inmate violence and security problems at the U.S. Penitentiary in Florence, Colorado (USP Florence). One of the events examined in that article was the 1999 murder of Joey Estrella in the USP Florence Special Housing Unit (SHU). Because the Bureau of Prisons (BOP) is notoriously reluctant to release any but the barest of details concerning any homicide that occurs inside one of its facilities, I relied to a great extent on public records and court documents in my initial reporting on the Estrella murder. However, it was apparent even at that point, many years before either William or Rudy Sablan would be brought to trial, that the circumstances of Estrella's death raised several matters of public interest and concern regarding the operation of the USP Florence SHU. These circumstances included, for example: (i) the high level of alcohol found in Estrella's body; (ii) the presence of three inmates in a cell designed to hold one (as well as the fact that two of the inmates were related to each other and had a history of assaulting other prisoners); (iii) the sharp weapon used to remove organs from the victim's body; and (iv) the apparent lack of timely

supervision that allowed this evisceration to take place. These circumstances all presented serious questions about prison safety, BOP policy, and staff training.

6. As I proceeded further in reporting on these issues, I discovered other contemporaneous incidents of violence in the USP Florence SHU, including at least one other cellmate-on-cellmate homicide. I also learned that the U.S. Department of Justice was investigating certain BOP employees assigned to the USP Florence SHU for allegedly falsifying reports, assaulting inmates, and self-inflicting injuries to provide a pretext for the assaults — a development that seemed not entirely unconnected to the failure of staff to respond to Estrella's efforts to seek assistance before and during his own fatal attack.

7. I eventually learned that BOP employees had recorded sound and images of Estrella's cellmates, William and Rudy Sablan, as well as of Estrella's body, in the aftermath of the murder. However, in reporting on the Estrella murder, I was forced to rely on secondhand accounts from sources who had some knowledge of the recordings, as the materials were not released to the media. Like any journalist who prizes accuracy, context, and thoroughness, I would strongly prefer to have access to primary source materials in a situation such as this one, rather than being forced to rely on the possibly faulty recollections of secondary witnesses. Given the total lack of comment or official cooperation from the BOP, access to such materials is critical.

8. Over the past eight years, federal prosecutors have brought William and Rudy Sablan to trial, unsuccessfully seeking the death penalty in each instance. Prosecutors also brought charges against numerous employees of USP Florence for assaulting inmates and falsifying documents and secured a few convictions. But many questions remain unanswered

3

about operations at USP Florence and possible staff complicity in the Estrella murder, in part because the BOP refuses to address these issues.

9. It is my understanding that the video record made by BOP staff of the Sablans' words and behavior after the Estrella murder was introduced as an exhibit and played in open court by the government on at least two occasions, first at William Sablan's trial and then at Rudy Sablan's trial. It is also my understanding that some or all of the Estrella autopsy photographs were introduced into evidence and shown in open court at each of these trials. Unfortunately, I was not able to be present in court when these exhibits were shown in open court. My employer, Westword, does not have the resources necessary to allow one staff writer to sit through the entirety of two lengthy death penalty trials.

10. I believe that public release of the materials requested by Prison Legal News in this case would advance the public interest in many ways.

11. It should be noted that public interest and concern about operations at USP Florence is ongoing. I have published several reports in recent years regarding claims of inadequate staffing, gang-related violence, and other operational issues at USP Florence. For example, an inmate uprising at USP Florence in April 2008 resulted in officers firing on prisoners and killing two of them. The facility is, to quote one of my reports, "a deeply dysfunctional prison with a violent history," and the Estrella homicide warrants particular examination in light of the ongoing problems at USP Florence.

12. The release of the exhibits shown in open court would provide journalists and the public with a better understanding of Estrella's killers and the conditions, motivations, and other circumstances that led to their horrific actions. It may also provide some insight into their

physical and mental condition when staff arrived — if, for example, they were intoxicated, which apparently remains a matter of some dispute.

13. These records would also provide journalists and the public with a better understanding of the conditions of confinement experienced by the Sablans and Estrella in terms of the cramped quarters resulting from the fact that the BOP had triple-celled these inmates at the time of Estrella's murder.

14. These records may also shed some light on staff comments and reaction to the homicide and regarding the larger issues surrounding management and operational failures at USP Florence at the time.

15. Furthermore, public release of the materials could possibly help to answer unresolved questions about how inmates in the most secure unit of one of the highest security prisons in the federal system obtained the weaponry, opportunity, intoxicants, leisure, and will to commit such a gruesome crime.

16. Finally, the records would significantly contribute to the public's understanding of the operations of the U.S. Department of Justice with respect to the authorization of federal death penalty prosecutions against William and Rudy Sablan.

17. In my opinion, these are all significant matters of public interest and concern that would be well-served by the release of the entire video record and autopsy photographs sought by Prison Legal News in this case.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: November 19, 2008

/s/ Alan Prendergast
Alan Prendergast
Staff Writer, Westword